153 P.3d 864 (2007)
Arturo ALEJANDRE and Norma Alejandre, husband and wife, Respondents,
v.
Mary M. BULL, a single person, Petitioner.
No. 76274-1.
Supreme Court of Washington, En Banc.
Argued September 29, 2005.
Decided March 1, 2007.
*865 Albert Joseph Golden, Attorney at Law, Walla Walla, WA, for Petitioner.
Ronald Kurt McAdams, McAdams Ponti & Wernette, Walla Walla, WA, for Respondents.
Diana M Kirchheim, Groen Stephens & Klinge LLP, Bellevue, for Amicus Curiae Wash. Ass'n of Relations.
Daniel Joseph Gunter, Riddell Williams PS, Shilpa Bhatia, Wilson Smith Cochran Dickerson, Seattle, for Amucis Curiae Wash. Defense Trial Lawyers.
MADSEN, J.
¶ 1 Petitioner Mary M. Bull sold a house to the respondents, Arturo and Norma Alejandre. The Alejandres subsequently learned the septic system was defective and sued Ms. Bull for fraudulently or negligently misrepresenting its condition. The trial court dismissed the Alejandres' claims after they rested their case, determining as a matter of law that the Alejandres had failed to prove their claims and that the claims are barred by the economic loss rule. The Court of Appeals reversed, concluding that sufficient evidence was presented in support of the claims and that the economic loss rule did not apply because the parties did not contractually allocate risk for fraudulent or misrepresentation claims.
*866 ¶ 2 We reverse the Court of Appeals. Under Washington law, the defective septic system at the heart of plaintiffs' claims is an economic loss within the scope of the parties' contract, and the economic loss rule precludes any recovery under a negligent misrepresentation theory. There is no requirement that a risk of loss must be expressly allocated in a contract before a tort claim based on that loss will be precluded under the economic loss rule. Further, although under existing case law the plaintiffs' fraudulent concealment claim based on Obde v. Schlemeyer, 56 Wash.2d 449, 353 P.2d 672 (1960) is not barred by the economic loss rule, that claim fails here because the Alejandres cannot meet their burden to show the defect in the septic system could not have been discovered through a reasonable inspection. Finally, insofar as the Alejandres assert common law fraud, they have failed to present sufficient evidence to survive a motion under CR 50.

FACTS
¶ 3 Ms. Bull owned a single family residence that was served by a septic system. The year before she put the house up for sale, Ms. Bull noticed soggy ground over the septic system. She hired William Duncan of Gary's Septic Tank Service to pump the tank. She also contacted Walt Johnson Septic Service, which emptied the tank and patched a broken pipe leading from the tank to the drain field. In April 2000, Ms. Bull applied for a connection to the city sewer, but when she learned there was a $5,000 hook-up fee she abandoned the idea.
¶ 4 Ms. Bull placed her home on the market in June 2000. In September 2001, Ms. Bull and the Alejandres entered into an earnest money agreement for the sale of Ms. Bull's home to the Alejandres. This agreement contained Ms. Bull's representation that the property was served by a septic system and her promise to have the septic tank pumped prior to closing. The earnest money agreement contained an addendum providing, among other things, that the sale was contingent on an inspection of the septic system. It stated that "[a]ll inspection(s) must be satisfactory to the Buyer, in the Buyer's sole discretion." Ex. 4. The addendum also provided that if the buyer disapproved of any inspection report, the buyer had to notify the seller and state the objection. Ex. 4. If the seller did not receive such notice, the inspection contingency would be deemed satisfied. Ex. 4.
¶ 5 As provided in the earnest money agreement, a septic tank service (Walt's Septic Tank Service) pumped the tank, and the Alejandres received a copy of the bill. The bill stated on it that the septic system's back baffle could not be inspected but there was "[n]o obvious malfunction of the system at time of work done." Ex. 6. In addition, prior to closing Ms. Bull provided the Alejandres with a seller's disclosure statement as required by RCW 64.06.020.[1] She disclosed that the house had a septic tank system which was last pumped and last inspected in the fall 2000 and that "Walt Johnson Jr. replaced broken line between house and septic tank," and she answered "no" to the inquiry whether there were any defects in operation of the septic system. Ex. 5.[2] Ms. Bull also disclosed that she was aware of changes or repairs to the system. The Alejandres reviewed the disclosure statement with their *867 agent and then signed the section of the disclosure statement headed "BUYER'S WAIVER OF RIGHT TO REVOKE OFFER." Ex. 5. See RCW 64.06.030. The Alejandres thus acknowledged, as expressly explained in the disclosure statement, their duty to "pay diligent attention to any material defects which are known to Buyer or can be known to Buyer by utilizing diligent attention and observation." Ex. 5.
¶ 6 Also prior to closing, the Alejandres lending bank required an inspection of the property. The resulting inspection report stated that its purpose was to notify the client of all defects or potential problems. The report indicated that the septic system "Performs Intended Function" and stated that "everything drains OK." Ex. 7.
¶ 7 On December 10, 2001, the sale closed. The Alejandres moved into the house a week later. In January 2002, the Alejandres smelled an odor inside their home. They also heard "water gurgling like it was coming back up." Verbatim Report of Proceedings at 15. They noticed a foul odor outside the home as well, which they believed came from the ground around the septic tank, which they said was soggy. In February, they hired William Duncan of Gary's Septic Tank Service. Mr. Duncan told the Alejandres that he could pump the tank but could not fix the problem because the drain fields were not working. He also told the Alejandres that he had told Ms. Bull that the drain fields were not working and that she needed to connect to the city's sewer system.
¶ 8 The Alejandres subsequently hired another company to connect to the city sewer system. During this work, the company discovered that the baffle to the outlet side of the septic system was gone, thus allowing sludge from the septic tank to enter the drain field and plug it.
¶ 9 The Alejandres sued Ms. Bull for fraud and misrepresentation, claiming costs and damages totaling nearly $30,000. After the plaintiffs rested their case, Ms. Bull moved for judgment as a matter of law. The court granted the motion, ruling that the economic loss rule bars the Alejandres' claims and that they failed to present sufficient evidence in support of their claims. The court entered judgment in favor of Ms. Bull and awarded her attorney fees as provided for in the parties' purchase and sale agreement.
¶ 10 The Alejandres appealed. The Court of Appeals reversed, holding that the Alejandres presented sufficient evidence to take their claims to the jury and that the economic loss rule does not apply because the parties' contract did not allocate risk for fraudulent or negligent misrepresentation claims. Alejandre v. Bull, 123 Wash.App. 611, 626, 98 P.3d 844 (2004).

ANALYSIS
¶ 11 When reviewing a trial court's decision on a motion for judgment as a matter of law, the appellate court applies the same standard as the trial court and reviews the grant or denial of the motion de novo. Davis v. Microsoft Corp., 149 Wash.2d 521, 531, 70 P.3d 126 (2003). "A motion for judgment as a matter of law must be granted `when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party.'" Id. (quoting Sing v. John L. Scott, Inc., 134 Wash.2d 24, 29, 948 P.2d 816 (1997)). "Substantial evidence" is evidence that is sufficient "`to persuade a fair-minded, rational person of the truth of a declared premise.'" Davis, 149 Wash.2d at 531, 70 P.3d 126 (quoting Helman v. Sacred Heart Hosp., 62 Wash.2d 136, 147, 381 P.2d 605 (1963)).
¶ 12 Ms. Bull maintains that the Alejandres' tort claims are precluded by the economic loss rule, as the trial court ruled.
¶ 13 The economic loss rule applies to hold parties to their contract remedies when a loss potentially implicates both tort and contract relief. It is a "device used to classify damages for which a remedy in tort or contract is deemed permissible, but are more properly remediable only in contract. . . . `[E]conomic loss describes those damages falling on the contract side of "the line between tort and contract".'" Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1, 124 Wash.2d 816, 822, 881 P.2d 986 (1994) (citation omitted) (quoting Wash. *868 Water Power Co. v. Graybar Elec. Co., 112 Wash.2d 847, 861 n. 10, 774 P.2d 1199, 779 P.2d 697 (1989) (quoting Pa. Glass Sand Corp. v. Caterpillar Tractor Co., 652 F.2d 1165, 1173 (3d Cir.1981))). The rule "`prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from contract'" because "`tort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement.'" Factory Mkt., Inc. v. Schuller Int'l, Inc., 987 F.Supp. 387, 395 (E.D.Pa.1997) (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir.1995) and Palco Linings, Inc. v. Pavex, Inc., 755 F.Supp. 1269, 1271 (M.D.Pa.1990)).
¶ 14 "Tort law has traditionally redressed injuries properly classified as physical harm." Stuart v. Coldwell Banker Commercial Group, Inc., 109 Wash.2d 406, 420, 745 P.2d 1284 (1987). It "is concerned with the obligations imposed by law, rather than by bargain," and carries out a "safety-insurance policy" that requires that products and property that are sold do not "unreasonably endanger the safety and health of the public." Id. at 421, 420, 745 P.2d 1284. Contract law, in contrast, carries out an "expectation-bargain protection policy" that "protects expectation interests, and provides an appropriate set of rules when an individual bargains for a product of particular quality or for a particular use." Id. at 420-21, 745 P.2d 1284. In general, whereas tort law protects society's interests in freedom from harm, with the goal of restoring the plaintiff to the position he or she was in prior to the defendant's harmful conduct, contract law is concerned with society's interest in performance of promises, with the goal of placing the plaintiff where he or she would be if the defendant had performed as promised. Detroit Edison Co. v. NABCO, Inc., 35 F.3d 236, 239 (6th Cir. 1994); see also Casa Clara Condo. Ass'n, Inc. v. Charley Toppino & Sons, Inc., 620 So.2d 1244, 1246-47 (Fla.1993).
¶ 15 The economic loss rule maintains the "fundamental boundaries of tort and contract law." Berschauer/Phillips, 124 Wash.2d at 826, 881 P.2d 986. Where economic losses occur, recovery is confined to contract "to ensure that the allocation of risk and the determination of potential future liability is based on what the parties bargained for in the contract. . . . If tort and contract remedies were allowed to overlap, certainty and predictability in allocating risk would decrease and impede future business activity." Id. A manufacturer or seller sets prices in contemplation of, among other things, potential contractual liability. See id. at 827, 881 P.2d 986. If tort liability is expanded to include economic damages, parties would be exposed to "`liability in an indeterminate amount for an indeterminate time to an indeterminate class.'" Id. (quoting Justice Cardozo in Ultramares Corp. v. Touche, Niven & Co., 255 N.Y. 170, 179, 174 N.E. 441, 74 A.L.R. 1139 (1931)). "A bright line distinction between the remedies offered in contract and tort with respect to economic damages also encourages parties to negotiate toward the risk distribution that is desired or customary." Berschauer/Phillips, 124 Wash.2d at 827, 881 P.2d 986. In addition, the economic loss rule prevents a party to a contract from obtaining through a tort claim benefits that were not part of the bargain. See, e.g., Daanen & Janssen, Inc. v. Cedarapids, Inc., 216 Wis.2d 395, 408, 573 N.W.2d 842 (1998).
¶ 16 In short, the purpose of the economic loss rule is to bar recovery for alleged breach of tort duties where a contractual relationship exists and the losses are economic losses. If the economic loss rule applies, the party will be held to contract remedies, regardless of how the plaintiff characterizes the claims. See Snyder v. Lovercheck, 992 P.2d 1079, 1088 (Wyo.1999) ("`when parties' difficulties arise directly from a contractual relationship, the resulting litigation concerning those difficulties is one in contract no matter what words the plaintiff may wish to use in describing it'" (quoting Beeson v. Erickson, 22 Kan.App.2d 452, 461, 917 P.2d 901 (1996))). Washington law consistently follows these principles. See Stuart, 109 Wash.2d at 420-22, 745 P.2d 1284; Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co., 115 Wash.2d 506, 799 P.2d 250 (1990); Touchet Valley Grain Growers, Inc. v. Opp & Seibold *869 Gen. Constr., Inc., 119 Wash.2d 334, 350-51, 831 P.2d 724 (1992); Berschauer/Phillips, 124 Wash.2d at 825-26, 881 P.2d 986; Staton Hills Winery Co. v. Collons, 96 Wash.App. 590, 595-96, 980 P.2d 784 (1999); Carlson v. Sharp, 99 Wash.App. 324, 994 P.2d 851 (1999); Griffith v. Centex Real Estate Corp., 93 Wash.App. 202, 211-13, 969 P.2d 486 (1998). The key inquiry is the nature of the loss and the manner in which it occurs, i.e., are the losses economic losses, with economic losses distinguished from personal injury or injury to other property. If the claimed loss is an economic loss, and no exception applies to the economic loss rule, then the parties will be limited to contractual remedies.
¶ 17 The same fundamental approach applies to products liability claims governed by the Washington Product Liability Actions Act, chapter 7.72 RCW (WPLA). The WPLA does not allow recovery for direct or consequential economic losses under the Uniform Commercial Code, Title 62A.RCW. RCW 7.72.010(6). Rather, the WPLA "confines recovery to physical harm of persons and property and leaves economic loss, standing alone, to the Uniform Commercial Code." Touchet Valley Grain Growers, 119 Wash.2d at 351, 831 P.2d 724. The court therefore applies a risk of harm analysis in the product liability setting under the WPLA to determine the nature of the damages and whether an economic loss has occurred, id., but, as in other cases, the focus is on the harm or injury and whether it constitutes an economic loss.
¶ 18 In Berschauer/Phillips, a general contractor sought to recover economic damages in tort from an architect, an engineer, and an inspector. We first noted that the case was not governed by the WPLA, and therefore turned to the common law to determine whether the economic loss rule precludes recovery in tort. We held that the economic loss rule applies to bar recovery of economic loss due to construction delays. Berschauer/Phillips, 124 Wash.2d at 825-27, 881 P.2d 986. We expressly did so in order to "align the common law rule on `economic loss' with the Legislature's" application of the rule under the WPLA to limit purely economic damages to contract claims under the UCC. Id. at 827, 881 P.2d 986.
¶ 19 The Alejandres maintain that the economic loss rule does not apply in the context here, i.e., the sale of a residence. However, as Ms. Bull contends, in this state the economic loss rule applies to tort claims brought by homebuyers. Stuart, 109 Wash.2d at 417-22, 745 P.2d 1284; Griffith, 93 Wash.App. at 212-13, 969 P.2d 486.[3] And, as in other circumstances, where defects in construction of residences and other buildings are concerned, economic losses are generally distinguished from physical harm or property damage to property other than the defective product or property. The distinction is drawn based on the nature of the defect and the manner in which damage occurred. In Stuart, 109 Wash.2d at 420-22, 745 P.2d 1284, and in Atherton, 115 Wash.2d 506, 799 P.2d 250, we declined to recognize any tort cause of action for negligent construction because the plaintiffs in each of these cases presented no evidence of personal or physical injury resulting from the manner in which the condominium complexes in *870 each case were constructed and instead sought only economic damages.
¶ 20 Here, the injury complained of is a failed septic system. Purely economic damages are at issue. See Stuart, 109 Wash.2d at 420, 745 P.2d 1284 (defects evidenced by internal deterioration are characterized as economic losses); Griffith, 93 Wash.App. at 213, 969 P.2d 486 (same). There is no question that the parties' relationship is governed by contract. Thus, unless there is some recognized exception to the economic loss rule that applies, the plaintiffs' claim of negligence cannot stand because they are limited to their contract remedies. No exception to the economic loss rule has been established.
¶ 21 The plaintiffs allege that Ms. Bull made negligent misrepresentations about the condition of the septic system contrary to the duty of due care under the Restatement (Second) of Torts § 552 (1977).[4] Both Berschauer/Phillips and Griffith hold that although Washington recognizes a tort claim for negligent misrepresentation under the Restatement (Second) of Torts § 552 (1977), this claim is not available when the parties have contracted against potential economic liability. Berschauer/Phillips, 124 Wash.2d at 827-28, 881 P.2d 986; Griffith, 93 Wash. App. at 212, 969 P.2d 486.
¶ 22 Accordingly, the Alejandres' reliance on § 552 and what must be proven under it is foreclosed by our precedent. Because the parties' relationship is governed by contract and the loss claimed is an economic loss, the trial court correctly concluded that plaintiffs' negligent misrepresentation claim must be dismissed. See, e.g., Atherton, 115 Wash.2d at 526-27, 799 P.2d 250 (negligent construction claim precluded where plaintiff sought only economic damages).
¶ 23 The Court of Appeals held, however, that if the parties fail to specifically allocate a risk of loss in their contract, the economic loss rule does not apply as to that risk. Alejandre, 123 Wash.App. at 626, 98 P.3d 844. This holding is inconsistent with the weight of authority and with Berschauer/Phillips.
¶ 24 In Berschauer/Phillips, we stated that our holding limiting the recovery of economic loss due to construction delays ensures "that the allocation of risk and the determination of potential future liability is based on what the parties bargained for in the contract. We hold parties to their contracts." Berschauer/Phillips, 124 Wash.2d at 826, 881 P.2d 986. We did not say, however, that the parties will be held to their bargained-for remedies only if they explicitly addressed any or all potential economic losses and allocated the risks associated with them.
¶ 25 Other courts have also rejected this premise. Courts reason, instead, that the economic loss rule applies where the parties could or should have allocated the risk of loss, or had the opportunity to do so. In Nextel Argentina, S.R.L. v. Elemar International Forwarding, Inc., 44 F.Supp.2d 1306, 1309 (Fla.1999), the court saw "`no reason to burden society as a whole with the losses of one who has failed to bargain for adequate contractual remedies.'" (Quoting Airport Rent-A-Car, Inc. v. Prevost Car, Inc., 660 So.2d 628, 630 (Fla.1995)). The court held that the "economic loss rule prevents recovery in tort for risks that should have been allocated in a contract." Nextel, 44 F.Supp.2d at 1309 (emphasis added). If the party could have allocated its risk, the rule applies; all that is required is that the party had an opportunity to allocate the risk of loss. Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 852 (6th Cir.2002); Lexington Ins. Co. v. W. Roofing Co., 316 F.Supp.2d 1142, 1148 (D.Kan.2004); Nat'l Steel Erection, Inc. v. J.A. Jones Constr. Co., 899 F.Supp. 268, 274 (N.D.W.Va.1995); Nigrelli Sys., Inc. v. E.I. DuPont de Nemours & Co., 31 F.Supp.2d 1134, 1138 (E.D.Wis.1999); BRW, Inc. v. Dufficy & Sons, Inc., 99 P.3d 66, 73 (Colo. 2004); Nw. Ark. Masonry, Inc. v. Summit Specialty Prods., Inc., 29 Kan.App.2d 735, 744-45, 31 P.3d 982 (2001); Neibarger v. Universal Coops., Inc., 439 Mich. 512, 521, *871 486 N.W.2d 612 (1992) (quoting Spring Motors Distribs., Inc. v. Ford Motor Co., 98 N.J. 555, 579-80, 489 A.2d 660 (1985)).
¶ 26 Further, where allocation of risk occurs, it can occur directly or indirectly. For example, parties might allocate risk through express contract terms, such as the inclusion of warranties, or through the procuring of insurance, or risk might be reflected in a lower price obtained by the buyer in exchange for the risk falling on the buyer. Maersk Line Ltd. v. CARE & ADM, Inc., 271 F.Supp.2d 818, 822 (E.D.Va.2003). As one court stated: "`Courts should assume that parties factor risk allocation into their agreements and that the absence of comprehensive warranties is reflected in the price paid. Permitting parties to sue in tort when the deal goes awry rewrites the agreement by allowing a party to recoup a benefit that was not part of the bargain.'" Daanen & Janssen, 216 Wis.2d at 408, 573 N.W.2d 842 (quoting Stoughton Trailers, Inc. v. Henkel Corp., 965 F.Supp. 1227, 1230 (W.D.Wis. 1997)); see Nigrelli Sys., 31 F.Supp.2d at 1138.
¶ 27 In fact, if a court permits a tort claim on the ground that the parties have not expressly allocated a particular risk, it interferes with the parties' freedom to contract. Rich Prods. Corp. v. Kemutec, Inc., 66 F.Supp.2d 937, 968-69 (E.D.Wis.1999), aff'd, 241 F.3d 915 (7th Cir.2001); see also Maersk Line, 271 F.Supp.2d at 822 ("`to permit a party to a broken contract to proceed in tort where only economic losses are alleged would eviscerate the most cherished virtue of contract law, the power of the parties to allocate the risks of their own transactions'" (quoting Princess Cruises, Inc. v. General Elec. Co., 950 F.Supp. 151, 155 (E.D.Va.1996), rev'd on other grounds, 143 F.3d 828 (4th Cir.1998))); Snyder, 992 P.2d at 1087 ("`[t]he effect of confusing the concept of contractual duties, which are voluntarily bargained for, with the concept of tort duties, which are largely imposed by law, would be to nullify a substantial part of what the parties expressly bargained for  limited liability'" (quoting Isler v. Texas Oil & Gas Corp., 749 F.2d 22, 23 (10th Cir.1984))).
¶ 28 In accord with the overwhelming weight of authority from other jurisdictions, and under our decision in Berschauer/Phillips, the economic loss rule applies regardless of whether the specific risk of loss at issue was expressly allocated in the parties' contract.
¶ 29 Finally, on this issue, a cautionary note is added. There is some suggestion that the economic loss rule applies only if the contract is between two sophisticated parties. However, we observed in Berschauer/Phillips, 124 Wash.2d at 827, 881 P.2d 986, that the "unsophisticated consumer" is deprived of economic damages under the WPLA. Just as the economic loss rule applies under the WPLA to "unsophisticated" parties, the same "bright line distinction between the remedies offered in contract and tort with respect to economic damages," Berschauer/Phillips, 124 Wash.2d at 827, 881 P.2d 986, may apply to "unsophisticated" parties who enter a contract on essentially equal footing.[5] If there is significant disparity in bargaining power, likely accompanied by some other contractual infirmity, then there may be an issue as to enforceability of the contract  a different question from whether tort remedies should be available.
¶ 30 The Alejandres' negligent misrepresentation tort claim is precluded under the economic loss rule for the reasons explained above.
¶ 31 The plaintiffs also assert a claim of fraudulent concealment. In Atherton, we rejected the plaintiff's claim of negligent construction as barred by the economic loss rule, but in the same opinion held that there was an issue of fact as to whether the defendant had fraudulently concealed construction practices violating the building code and therefore the trial court had erred in dismissing the plaintiffs' claim for fraudulent concealment on a motion for summary judgment. Atherton, 115 Wash.2d at 523-27, 799 P.2d 250. Thus, under Atherton, the Alejandres' fraudulent concealment claim is not precluded by the economic loss rule.
*872 ¶ 32 However, the fraudulent concealment claim fails because, as the trial court ruled, the Alejandres failed to present sufficient evidence to support the claim. Under Obde, 56 Wash.2d 449, 353 P.2d 672, and similar cases, the vendor's duty to speak arises (1) where the residential dwelling has a concealed defect; (2) the vendor has knowledge of the defect; (3) the defect presents a danger to the property, health, or life of the purchaser; (4) the defect is unknown to the purchaser; and (5) the defect would not be disclosed by a careful, reasonable inspection by the purchaser. Atherton, 115 Wash.2d at 524, 799 P.2d 250. The Alejandres failed to meet their burden of showing that the defect in the septic system would not have been discovered through a reasonably diligent inspection. In fact, the Alejandres accepted the septic system even though the inspection report from Walt's Septic Tank Service disclosed, on its face, that the inspection was incomplete because the back baffle had not been inspected. The testimony at trial showed that this part of the septic system was relatively shallow and easily accessible for inspection. A careful examination would have led to discovery of the defective baffle and to further investigation.
¶ 33 Next, insofar as the Alejandres have asserted common law fraud theories, they have failed to present sufficient evidence of the nine elements of fraud. See Williams v. Joslin, 65 Wash.2d 696, 697, 399 P.2d 308 (1965). In particular, they have failed to present sufficient evidence as to the right to rely on the allegedly fraudulent representations about the condition of the septic service. The "right to rely" element of fraud is intrinsically linked to the duty of the one to whom the representations are made to exercise diligence with regard to those representations. Id. at 698, 399 P.2d 308; Puget Sound Nat'l Bank v. McMahon, 53 Wash.2d 51, 54, 330 P.2d 559 (1958). As explained, the Alejandres were on notice that the septic system had not been completely inspected but failed to conduct any further investigation and indeed, accepted the findings of an incomplete inspection report. Having failed to exercise the diligence required, they were unable to present sufficient evidence of a right to rely on the allegedly fraudulent representations.[6]
¶ 34 Accordingly, the trial court correctly determined, as to the Alejandres' fraudulent conveyance and fraudulent representation theories, that Ms. Bull was entitled to judgment as a matter of law under CR 50 because the Alejandres failed to present sufficient evidence in support of these theories.
¶ 35 Finally, we turn to Ms. Bull's request for attorney fees. The parties purchase and sale agreement provides that attorney fees and costs shall be awarded to the prevailing party in any dispute relating to the transaction. Ex. 4; see RCW 4.84.300. Accordingly, Ms. Bull is entitled to attorney fees as the prevailing party, at trial, as the trial court ruled, and on appeal and discretionary review, to be awarded pursuant to RAP 18.1.

CONCLUSION
¶ 36 In this case involving the sale of a residence with a defective septic system, we hold that the economic loss rule applies and *873 forecloses the buyers' claim that the seller negligently misrepresented the condition of the septic system. The buyers' claim of fraudulent conveyance is not subject to the economic loss rule. However, the buyers failed to present sufficient evidence on this claim and on their claims of fraudulent misrepresentation to take these issues to the jury. The trial court properly dismissed all of the claims under CR 50 at the close of the plaintiffs-buyers' case.
¶ 37 We reverse the Court of Appeals and reinstate the trial court's judgment, including the award of attorney fees and costs, and we award attorney fees and costs to Ms. Bull for the appeal and this discretionary review, as provided for in the parties' contract.
WE CONCUR: GERRY L. ALEXANDER C.J., CHARLES W. JOHNSON, SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON, BOBBE J. BRIDGE, JJ.
CHAMBERS, J. (concurring in result).
¶ 38 I agree with the majority in result but write separately to suggest a different analytical approach to the economic loss rule.
¶ 39 Like the majority, I would reject Arturo and Norma Alejandre's negligent misrepresentation claim. Once the economic loss rule is applied, this negligent misrepresentation claim is revealed to be a breach of contract claim, not remediable in tort. Like the majority, I would hold that the contract does not control the Alejandres' fraudulent concealment claim. In this state, fraud is not a contract claim. Like the majority, I would hold that the Alejandres failed to present sufficient evidence on all of their claims and that the trial court properly dismissed them.
¶ 40 Unlike the majority, I do not believe that the best approach to the economic loss rule is to find it bars recovery for any undefined economic loss between parties whose relationship is governed by contract unless an exception applies. Cf. majority at ____. The economic loss rule is a misnomer, and the majority mistakes the name of the doctrine for its function.
¶ 41 Instead, I would approach the economic loss rule in light of what it is: a tool we use to ensure that tort is tort, contract is contract, and that each comes with its own remedies. The distinction between tort and contract matters because our society has made the rational choice to limit contract remedies to the typically efficient remedies laid out by the specific contract signed by the parties or provided by background contract and commercial law. Spring Motors Distribs., Inc. v. Ford Motor Co., 98 N.J. 555, 561, 489 A.2d 660 (1985).[1] Our society has also made the rational choice that tort remedies should make the victim whole and thus often include significant consequential damages, such as pain and suffering, which are generally inappropriate for mere breaches of contract. See Rardin v. T & D Mach. Handling, Inc., 890 F.2d 24, 25-26 (7th Cir.1989). Only after I determined that there was a potential question as to whether a suit filed in tort should instead sound in contract would I examine whether the loss was, rightly understood, an "economic loss"  that is to say, a "commercial loss," properly addressed in contract law. Miller v. U.S. Steel Corp., 902 F.2d 573, 574 (7th Cir.1990). In this case, either approach achieves the same results.
¶ 42 The majority aptly recites the relevant facts. Mary Bull, an elderly widow, sold her home to a young couple. The house had a septic system that had needed significant repair in recent years. A repairman told her that her system was unrepairably defective and that she should connect to the city's sewer system. Bull made some initial inquiries about connecting to the sewer system but did not follow through.
¶ 43 At the time the Alejandres made an offer on the house, the septic system was *874 performing adequately. Bull disclosed that she had had the system repaired recently. She did not disclose (and it appears may not have remembered or understood) the extent of the septic system's problems or that she had been told to connect to the city's sewer system.
¶ 44 Before buying Bull's home, the Alejandres had her septic system inspected by two different inspectors. Their inspectors reported that the septic system appeared to be working, though one cautioned that he was unable to examine parts of it. Unfortunately, shortly after the Alejandres purchased the home, the system began to fail. By chance, the Alejandres sought help from the very person who had originally told Bull that the system was fatally flawed. In the end, the couple spent around $30,000 to have adequate plumbing in a house they purchased for $115,000.

THE ECONOMIC LOSS RULE
¶ 45 Bull argues, and the trial court agreed, that the Alejandres' claims are barred by the "economic loss rule." Claims for breach of contract and some tort claims, especially products liability claims, often bear great similarity to one another. Tort remedies are often, perhaps always, significantly larger than contract remedies. It appears to me that the economic loss rule is a response to the risk that the tort remedies available in products liability law, if applied in contract law, could gut it. One way we have prevented the death of contract is through the economic loss rule. It prevents one party to a contract from rewriting the damage provisions after a breach by styling the case in tort. As the inimitable Judge Richard Posner put it:
The insight behind the [economic loss rule] doctrine is that commercial disputes ought to be resolved according to the principles of commercial law rather than according to tort principles designed for accidents that cause personal injury or property damage. A disputant should not be permitted to opt out of commercial law by refusing to avail himself of the opportunities which that law gives him.
Miller, 902 F.2d at 575; see also Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1, 124 Wash.2d 816, 821, 881 P.2d 986 (1994); E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 866, 872-74, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (warning that without some sort of analytical tool to separate them, "contract law would drown in a sea of tort"); Seely v. White Motor Co., 63 Cal.2d 9, 403 P.2d 145, 45 Cal.Rptr. 17 (1965) (first clearly articulating an economic loss rule to divide tort and contract remedies.)[2]
¶ 46 I say the rule is unfortunately named because describing the "loss" as economic is not particularly helpful and can be positively misleading. Again, as Judge Posner quite aptly noted:
It would be better to call it a `commercial loss,' not only because personal injuries and especially property losses are economic losses, too  they destroy values which can be and are monetized  but also, and more important, because tort law is a superfluous and inapt tool for resolving purely commercial disputes. We have a body of law designed for such disputes. It is called contract law.
Miller, 902 F.2d at 574.
¶ 47 "Economic loss" (for which I suggest we read in our heads "commercial loss") includes "`the diminution in the value of [a] product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'" Christopher Scott D'Angelo, The Economic Loss Doctrine: Saving Contract Warranty Law from Drowning in a Sea of Torts, 26 U. Tol. L.Rev. 591, 592 (1995) (quoting Comment, Manufacturers' Liability to Remote *875 Purchasers for `Economic Loss' Damages  Tort or Contract?, 114 U. Pa. L.Rev. 539, 541 (1966)). It "is called in law an `economic loss,' to distinguish it from an injury to the plaintiff's person or property (property other than the product itself), the type of injury on which a products liability suit usually is founded." Miller, 902 F.2d at 574.
¶ 48 Thus, merely because a loss can be expressed in economic terms, it is not necessarily an "economic loss" triggering application of the unfortunately named "economic loss rule." See Miller, 902 F.2d at 575. I recognize that this is the sort of linguistic perversity that gets lawyers laughed at. Nonetheless, I point it out because I fear the majority may be misunderstood as holding that we start from the position that any damage, or at least any property damage, that can be expressed in a dollar figure is presumptively an economic loss and the economic loss rule will keep a case out of tort (whether or not a contractual relation that could give rise to relief exists) unless an exception applies. While in most cases, that will get us to the right type of law, it is a needlessly complicated way to approach the problem.
¶ 49 In my view, we should start by recognizing that the "economic loss rule" is the analytical tool we use to determine whether a dispute implicates tort or contract law in those cases that could potentially sound in either. Cf. Berschauer/Phillips, 124 Wash.2d at 826, 881 P.2d 986; see also Factory Mkt., Inc. v. Schuller Int'l, Inc., 987 F.Supp. 387, 395 (E.D.Pa.1997).[3] Once the choice is made, then the applicable measure of damages either in tort or contract, may be applied. This approach empowers contracting parties to negotiate remedies just like any other contract term, while recognizing the tort duties of care all owe to all. Berschauer/Phillips, 124 Wash.2d at 821-28, 881 P.2d 986. It also gives appropriate deference to the legislature's decision to impose different statutes of limitations in different areas of law. See generally Spring Motors Distribs., 98 N.J. at 561, 489 A.2d 660. Especially in products liability, an area of law that had its origins in contracts before finding its home in tort, the economic loss rule can be very helpful in deciding whether a particular "products liability" case is really a breach of contract claim in disguise. See generally E. River, 476 U.S. at 871, 106 S.Ct. 2295; Miller, 902 F.2d 573.
¶ 50 We have used the economic loss rule in residential purchase and sale disputes already. Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co., 115 Wash.2d 506, 526-27, 799 P.2d 250 (1990); Stuart v. Coldwell Banker Commercial Group, Inc., 109 Wash.2d 406, 417-21, 745 P.2d 1284 (1987); Griffith v. Centex Real Estate Corp., 93 Wash.App. 202, 213, 969 P.2d 486 (1998). Often in the real property context, the breach of contract is revealed when the property suffers damage. Property damage often invokes tort remedies, but, "[i]ncidental property damage, however, will not take a commercial dispute outside the economic loss doctrine; the tail will not be allowed to wag the dog." Miller, 902 F.2d at 576 (citing Chi. Heights Venture v. Dynamit Nobel of Am., Inc., 782 F.2d 723, 726-29 (7th Cir.1986)).
¶ 51 This demonstrates why understanding "economic loss" to mean "commercial loss" *876 would be helpful. When a piece of property is bought that is worth less because of a property defect, that is easily understood to be a commercial loss. But that exact same damage caused by a trespass or nuisance, or occurring in a products liability context, may well sound in tort. In those cases, the "loss," properly understood, is not a commercial loss and does not arise from a breach of contract. While the loss can be expressed in economic terms (and what cannot be in these days?) the damage should properly be understood to be a property damage, potentially giving rise to relief in tort.
¶ 52 While negligent misrepresentation may sound in tort, see Restatement (Second) of Torts § 552 (1977), in this case, the claim falls under the contract these parties signed. The remedies available to the parties are controlled by the contract between the parties.
¶ 53 Turning briefly to whether there is potential relief in contract, under the inspection addendum to the contract, the Alejandres were authorized to inspect the septic system and required to notify Bull that they found it unsatisfactory within 10 days. Fairly read, that contractual language put a duty of due diligence on the Alejandres to take steps to protect themselves and to anticipate that Bull might not have complete knowledge of the workings of an underground system. Cf. Ex. 5 ("Buyer acknowledges the duty to pay diligent attention to any material defects which are known to Buyer or can be known to Buyer by utilizing diligent attention and observation."). Thus, it was the Alejandres' duty, under the purchase and sale agreement, to exercise due diligence and to satisfy themselves that the septic system was acceptable. If, upon a reasonably diligent inspection, they discovered the septic system was not in good working order, their remedy under the purchase and sale agreement was to rescind the contract or seek other contract remedies. I conclude under the facts of this case that the contract controls, and this claim properly sounds in contract, not tort. To recover, they must prove that the contract they signed was breached. They have not done so. I agree with the majority that the economic loss rule takes this case to contract, and under the contract, they have no claim.[4]

FRAUD
¶ 54 The majority is correct that the economic loss rule does not preclude the Alejandres' fraudulent concealment claim. Majority at 871 (citing Atherton, 115 Wash.2d at 523-27, 799 P.2d 250). Whether we see this as an exception to the economic loss rule or simply that we recognize that in this state, being defrauded is a dignitary injury, not a commercial one, we reach the same result. I concur with the majority that the Alejandres have not submitted sufficient evidence to go to the jury with this claim, or on their common law fraud theories. I also agree with the majority that Bull is entitled to her attorney fees.

CONCLUSION
¶ 55 A house was purchased with a defective septic system. I do not wish to minimize the significant injury the Alejandres have suffered because of this. The cost of repair was close to a third of the purchase price of the house. I too would be outraged and looking for someone to sue.
¶ 56 But the Alejandres' claim for negligent misrepresentation was primarily a claim for a commercial loss, stemming from an alleged beach of contract. To recover in tort, "`there must be a showing of harm above and beyond disappointed expectations evolving solely from a prior agreement.'" Factory Mkt., 987 F.Supp. at 396 (quoting Sun Co., 939 F.Supp. at 371). They have not shown this, nor have they proved breach of contract. While a fraud claim is not barred by the economic loss rule, they have not submitted sufficient evidence to take theirs *877 to the jury. I concur with the majority in result.
WE CONCUR: Justice RICHARD B. SANDERS.
NOTES
[1] Chapter 64.06 RCW contains requirements for sellers of residential real property to make certain disclosures unless the buyer has expressly waived the right to receive the disclosure statement or the sale is exempt from the disclosure requirements under RCW 64.06.010. RCW 64.06.020(1). If the buyer does not waive the right, the buyer can, in the buyer's sole discretion, rescind the earnest money agreement within three business days after receipt of the disclosure statement. RCW 64.06.030.
[2] The Alejandres maintain that Ms. Bull knew that the disclosure statement was wrong in stating that the tank was last pumped in the fall, rather than in May 2000, and that a broken pipe was replaced between the house and the tank, rather than between the tank and the drain field. At trial Ms. Bull was unsure why she said "fall" rather than "May" and she testified that the line was not broken between the house and the tank. The Alejandres also maintain that Ms. Bull failed to disclose that she had to do her laundry outside the home because of the failed system. Ms. Bull says she did not disclose that she did her laundry outside the home for one month because the problem with the system was taken care of by the time she filled out the disclosure form.
[3] Other courts have applied the economic loss rule to homeowners alleging construction defects. In Casa Clara, 620 So.2d at 1247, the court stated:

If a house causes economic disappointment by not meeting a purchaser's expectations, the resulting failure to receive the benefit of the bargain is a core concern of contract, not tort, law. There are protections for homebuyers, however, such as statutory warranties, the general warranty of habitability, and the duty of sellers to disclose defects, as well as the ability of purchasers to inspect houses for defects. Coupled with homebuyers' power to bargain over price, these protections must be viewed as sufficient when compared with the mischief that could be caused by allowing tort recovery for purely economic losses. Therefore, we again "hold contract principles more appropriate than tort principles for recovering economic loss without an accompanying physical injury or property damage." Florida Power & Light [Co. v. Westinghouse Elec. Corp.], 510 So.2d [899,] 902 [(Fla.1987)]. If we held otherwise, "contract law would drown in a sea of tort." East River [S.S. Corp. v. Transamerica Delaval, Inc.], 476 U.S. [858,] 866[, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986)].
(Citation and footnotes omitted.)
[4] The Alejandres briefing to the Court of Appeals also relies on § 552 for their argument that alternatively, Ms. Bull made "innocent misrepresentations." Just as reliance on this tort provision is foreclosed insofar as alleged negligent misrepresentation is concerned, it is also foreclosed for alleged innocent misrepresentation.
[5] Exact parity in bargaining power is not required. Mt. Lebanon, 276 F.3d at 852.
[6] The Alejandres urge the court to hold that the economic loss rule does not apply to claims of fraud in the inducement, and they argue their fraud claims are claims of fraud in the inducement. We are aware that some courts recognize a broad exception to the economic loss rule that applies to intentional fraud. E.g., First Midwest Bank, N.A. v. Stewart Title Guar. Co., 218 Ill.2d 326, 337, 843 N.E.2d 327, 300 Ill.Dec. 69 (2006) (citing Moorman Mfg. Co. v. Nat'l Tank Co., 91 Ill.2d 69, 88-89, 435 N.E.2d 443, 61 Ill.Dec. 746 (1982)). Other courts recognize a limited exception to the economic loss rule for fraudulent misrepresentation claims that are independent of the underlying contract (sometimes referred to as fraud in the inducement) but only where the misrepresentations are extraneous to the contract itself and do not concern the quality or characteristics of the subject matter of the contract or relate to the offending party's expected performance of the contract. See, e.g., Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc., 209 Mich.App. 365, 532 N.W.2d 541 (1995) (leading case); Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 223 F.3d 873, 884-87 (8th Cir.2000); Rich Prods., 66 F.Supp.2d at 977; Indem. Ins. Co. v. Am. Aviation, Inc., 891 So.2d 532, 537 (Fla.2004). We need not address the question whether any or all fraudulent representation claims should be foreclosed by the economic loss rule because we resolve the Alejandres' fraudulent representation claims on other grounds.
[1] As the New Jersey Supreme Court noted:

[A] seller's duty of care generally stops short of creating a right in a commercial buyer to recovery a purely economic loss. Thus viewed, the definition of a seller's duty reflects a policy choice that economic losses inflicted by a seller of goods are better resolved under principles of contract law. In that context, economic interests traditionally have not been entitled to protection against mere negligence.
Spring Motors Distribs., 98 N.J. at 579, 489 A.2d 660.
[2] Over the years, the economic loss rule has been applied in cases where there was no privity of contract between the parties. This is because there are types of injuries for which the law gives no remedy, and injuries to third parties stemming from someone else's breach of contract are often (though not always) of that type. Properly used, the economic loss rule can be a useful tool to tell us if the claim is also of that type. Cf. Spring Motors Distribs., 98 N.J. at 561, 489 A.2d 660. None of this is before us today. See generally Berschauer/Phillips, 124 Wash.2d 816, 881 P.2d 986.
[3] As the Pennsylvania District Court noted:

In general, the economic-loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." "The rationale of the economic loss rule is that tort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." Compensation for losses suffered as a result of a breached agreement "requires an analysis of damages which were in the contemplation of the parties at the origination of the agreement, an analysis within the sole purview of contract law." "In order to recover negligence, `there must be a showing of harm above and beyond disappointed expectations evolving solely from a prior agreement. A buyer, contractor, or subcontractor's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects.'"
Factory Mkt., 987 F.Supp. at 395-96 (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir.1995); Palco Linings, Inc. v. Pavex, Inc., 755 F.Supp. 1269, 1271 (M.D.Pa.1990); Auger v. Stouffer Corp., 1993 U.S. Dist. LEXIS 12719, at *9, No. CIV.A.93-2529, 1993 WL 364622, at *3 (E.D.Pa. Aug.31, 1993); Sun Co. v. Badger Design & Constructors, Inc., 939 F.Supp. 365, 371 (E.D.Pa.1996)).
[4] I disagree slightly with the majority that "the economic loss rule applies regardless of whether the specific risk of loss at issue was expressly allocated in the parties' contract." Majority at 871. Rather I would say that whether or not a claim sounds in tort or contract is not dependent upon whether or not the parties have allocated the risk. The contractual risk allocation goes to whether a contractual term has been breached, not to whether a case sounds in tort or contract.