IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DONNA WOODCOCK, a single person, | ) | No. 78166-9-I |
| | ) | (consolidated with Nos. |
| Appellant/Cross Respondent, | ) | 78561-3 & 78562-1) |
| | ) | |
| v. | ) | |
| | ) | |
| CATHERINE CONOVER (née JENKINS) | ) | DIVISION ONE |
| and MIKE CONOVER, and the marital | ) | |
| community comprised thereof; and | ) | |
| SHERRY VOELKER-HORNSBY, all | ) | |
| Washington residents, | ) | |
| | ) | |
| Respondents/Cross Appellants, | ) | UNPUBLISHED OPINION |
| | ) | |
| WINSTON MCCLANAHAN and "JANE | ) | |
| DOE" MCCLANAHAN, and the martial | ) | |
| community comprised thereof; and "JOHN | ) | |
| DOE," all Washington residents, | ) | |
| | ) | |
| Defendants. | ) | FILED: September 9, 2019 |
| | ) | |

ANDRUS, J. — Donna Woodcock challenges the summary judgment dismissal of her claims against Catherine and Mike Conover, from whom she purchased a home, and her claims against Sherry Voelker-Hornsby, her real estate agent in the transaction. Catherine[1] cross-appeals the denial of her motion for attorney fees under the real estate purchase and sale agreement (REPSA). Sherry cross-appeals the denial of her motion for fees and costs under CR 11. We

_____

[1] We refer to the parties by their first names for convenience only. By doing so, we mean no disrespect.

reverse and remand for an award of attorney fees to Catherine, but otherwise affirm the trial court's rulings.

## FACTS

In 2016, Donna hired Sherry as her real estate agent to assist in purchasing Catherine's 113-year-old home in West Seattle. Donna understood the home was a "fixer-upper." She described the home's many problems:

> The retaining walls in the backyard were ready to cave in because the wood was rotting. The concrete below the wood wall was also leaning towards the back of the house. The walkway was slanted so the water was going under the house. The house needed all new electrical wiring in addition to putting the outside wires in PVC, installing the meter into a box and replacing the mast. [A] [g]utter was crushed because the wood wall behind the house was too high and the weight of the dirt pushed that wall against the house. There were over grown [sic] trees in the front yard that made a mess of the street and parked cars in addition to interfering with the wires coming from the street. One of the trees was about a foot from the house, it was top heavy and was a safety hazard due to high winds in that area. The stairs in the backyard were not up to code.

During negotiations for the purchase, Donna received Catherine's "Seller Disclosure Statement, Form 17." Catherine stated in the Form 17 that the house was served by a public sewer system and connected to the city's sewer main. In response to the question asking about any defects in the plumbing system, Catherine responded "Don't know." She similarly responded that she did not know of any other "existing material defects affecting the property that a prospective buyer should know about." The Form 17 advised Donna to obtain and pay for an expert, including a plumber, to inspect the property to identify a more comprehensive list of possible defects.

As part of the purchase offer, Donna executed an acknowledgement in the Form 17, in which she stated she understood she had "a duty to pay diligent

- 2 -

attention to any material defects that are known to [her] or can be known to [her] by utilizing diligent attention and observation." She further acknowledged that the disclosures in the Form 17 were "not intended to be a part of the written agreement between [Catherine and her]."

Donna and Catherine signed the REPSA on September 23, 2016. The agreement, like the Form 17, "urged [Donna] to use due diligence to inspect the Property to [her] satisfaction and to retain inspectors qualified to identify the presence of defective materials and evaluate the condition of the Property as there may be defects that may only be revealed by careful inspection."

In a separate inspection addendum to the REPSA, the parties agreed the sale was conditioned on Donna's subjective satisfaction with inspections of the property. One of the contemplated inspections explicitly identified was "an inspection of the sewer system," including "a sewer line video inspection and assessment." The addendum set up two inspection periods—the "Initial Inspection Period," during which Donna had six days to conduct whatever inspections she deemed appropriate; and an "Additional Inspections" period, during which Donna had an additional day to investigate the home's condition in the event an inspector recommended "further evaluation of any item by a specialist."

Under an optional clauses addendum, Catherine represented "[t]o the best of [her] knowledge," the property was connected to a public sewer main. Under that same addendum, Donna had the right to reinspect the property within five days of the closing date of November 22, 2016, to determine if any system— including the plumbing system—had become inoperative or had malfunctioned

since the Initial Inspection Period. Donna also had the right to require Catherine to repair or replace any malfunctioning system.

Sherry testified that she recommended that Donna obtain both a structural and sewer inspection. Sherry suggested that both inspections could be set for September 27, 2016. Donna, however, told Sherry that she did not want a sewer inspection until after she had reviewed the results of the structural inspection. Donna testified she made this decision because she was not sure she wanted to buy the house—it was old, sat on stilts, needed a new roof, had landscaping issues, and had water flowing underneath the crawl space.

Sherry reached out to Catherine's real estate agent to schedule a sewer inspection for the day after the structural inspection. According to Sherry, Donna then told her not to hire a sewer inspector, even after Sherry offered to reduce her commission by the $250 it would cost to have this inspection completed.

Donna testified that she wanted a sewer inspection because of her concerns about the house's age, but she did not recall Sherry scheduling this inspection. She admitted telling Sherry to hold off until after the structural inspection. But by the time she received the structural inspection report, more than six days had passed, and Sherry told her "it was too late to have the inspection" because the inspection period had lapsed. This conversation occurred, to the best of Donna's recollection, on September 30, 2016. Donna testified that Sherry then said that a sewer inspection was probably not necessary because Catherine's boyfriend, Mike,[2] was a plumber.

---

[2] Catherine and Mike were engaged at the time of the purchase and had married before Donna filed the lawsuit.

But Catherine presented evidence through an email in which Donna explained why she decided to forgo a sewer inspection: "The inspector didn't notice anything strange with the plumbing because everything from the inside of the house seemed to be working properly so I didn't feel that I needed to do a sewer inspection also." Donna admitted it was she, and not Sherry, who chose to skip the sewer inspection.

As a result of the structural inspection, Donna requested and Catherine agreed to repair a number of items, including moving soil away from particle board and plywood paneling on the home, trimming vegetation, repairing a kitchen window, repairing a rusted gas shut off valve, repairing duct work in the crawl space, having a licensed contractor evaluate and repair posts and footings in the crawl space, installing vapor barriers between concrete pier blocks and wood posts in the crawl space, installing junction box cover plates, fixing loose wiring in the crawl space, replacing the inoperable kitchen exhaust fan, updating kitchen electrical and lighting outlets, and replacing broken outlets in the living room.

The day before closing, Donna visited the house for a final walkthrough to verify that Catherine had completed these negotiated repairs. Donna looked under the crawl space and saw "a moisture problem" and "wet sand." She took photos and sent them to Sherry and her loan officer, Scott Rongey. Rongey indicated that if the agreed-upon repairs had not been completed, and closing had to be postponed, the parties would need to execute an addendum to the REPSA. He further indicated that Donna's loan rate lock expired later that week, and he would have to verify that the bank would extend the loan rate if the parties pushed out the closing date. He noted that since the work to be done by the seller was not

called for in the bank's appraisal, it would not jeopardize the loan, "[a]lthough the picture of the crawl space does not look good." Rongey subsequently confirmed that he could extend Donna's rate lock until the following Monday if she wanted to extend the closing date. Nevertheless, Donna emailed both Rongey and Sherry to "proceed with the closing tomorrow, I will deal with the problems when I move in." Sherry testified that Donna took this step without speaking with her about other options for investigating the crawl space condition. Donna closed on the home as scheduled, on November 22, 2016.

Shortly after closing, in December 2016, an electrician working in Donna's house called her to complain that a plumber was under her house and interfering with his work. The electrician told her that he saw a man covered in mud and wearing plumber's overalls come out from under the crawl space. Donna, who had not hired a plumber, called Sherry to ask why someone would be under the house. Donna knew that there were several items Catherine was still in the process of fixing, including securing a beam underneath the house and installing a vapor barrier. Donna learned that Mike had been there either to complete an item remaining on the repair list or to verify that the work had been done.

Mike, however, testified that he visited the home because he had received a report of water intrusion in the crawl space. According to Mike, he told Donna's electrician why he was there, then entered the crawl space with a flashlight and found a couple of shovels that did not belong to him. He saw no evidence of a leak.

A few days later, Donna noticed a stream of what she thought was rainwater flowing into the crawl space from behind her house. She called a landscaper to

look at the retaining wall in her backyard because she thought the water was coming from behind that wall. The landscaper confirmed that rainwater was flowing onto her land from an adjacent greenbelt. The landscaper cleaned out and replaced some gutters, dug out dirt behind the retaining wall and filled it with drain rock, and installed a plastic vapor barrier to stop rainwater from flowing into the crawl space.

In March 2017, Donna noticed a plugged downspout and became concerned that the overflowing rainwater was dripping through her patio and onto her furnace, located in the crawl space. Donna went into the crawl space to investigate and found brown, frothy-looking water containing toilet paper and feces on the ground underneath her bathroom. Donna saw what she described as "trenching" and an electric work light and tools, items she thought Mike had left behind in December 2016.

A plumber found that the three-inch plastic drain pipe running from the toilet was set loosely in a four-inch clay pipe with no gasket to seal the joint between the two pipes. He trenched approximately 15 feet to uncover the side sewer and found pieces of newer PVC pipe loosely connected to pieces of older clay pipe. He found several locations where the diameter of the PVC replacement pipe mismatched the existing, cracked four-inch clay pipe. He also found dirt and tree roots obstructing the sewer pipe. These downstream obstructions caused sewage to back up and leak through the unsealed joints in the pipes. According to Donna, the plumber also told her that while he was digging in the dirt, he saw lime, a substance often used to cover up the smell of raw sewage. The plumber advised Donna she needed to replace the entire length of sewer pipe.

Donna hired Rescue Rooter to repair the sewer system. Rescue Rooter was unable to get a camera through all of the pipes because they were full of dirt and roots. A Rescue Rooter representative testified that he saw "piecemeal" connections between newer plastic pipes and deteriorated clay pipes. He identified a two-foot section of the sewer line between the house and the city's main sewer line that was not connected at either end, allowing roots, dirt, and debris to enter and plug the pipes. According to Donna, a Rescue Rooter representative said that this sewer problem would have existed for some time and that Catherine must have known about it. Rescue Rooter replaced or lined the existing pipe, creating a new and watertight connection to the city sewer main.

Donna presented evidence that Catherine was aware of plumbing problems that she did not disclose on the Form 17. In June 2016, in preparation for listing the home, Catherine hired North by West Inspections, LLC (NBWI) to inspect the home. NBWI reported that the tub drained slowly and that the drain waste vent in the crawl space had separated or had been severed, was leaking, and was causing soil erosion. It recommended further evaluation by a licensed plumber. According to Sherry, neither Catherine nor her real estate agent provided Donna with NBWI's inspection report. Mike testified that he hired one of his former employees, a licensed plumber, to repair the pipe. Catherine stated, in discovery responses, that before listing her home for sale, a plumber repaired the severed drain waste vent pipe by connecting the pipe to the drain line from her kitchen sink, toilet, shower, and bathroom lavatory.

Also in discovery, Catherine reported having a sewer backup in 2004, shortly after she bought the house, and having a tree root removed from her sewer

line. She denied having any other problems with the sewer line thereafter. But in July 2016, also before listing the house, Catherine hired a company, PipePix, to conduct a video scope of the sewer line. Catherine testified that she never saw the video and assumed her real estate agent had made it available to prospective buyers. According to Donna's plumbing expert, Chris Gemmer, the PipePix scope revealed that the sewer line was plugged with roots and toilet paper. He was also able to observe badly offset pipes and pipes filling up with water, indicating the sewer line was clogged.

Donna sued Catherine and Mike, alleging fraudulent concealment, fraudulent misrepresentation, and conspiracy to commit fraud. She sued Sherry for professional negligence.[3] The trial court dismissed Donna's claims on summary judgment. It denied Catherine's request for attorney fees under the REPSA and denied Sherry's request for CR 11 sanctions against Donna's counsel. All parties appeal.

## ANALYSIS

### A. Donna's failure to conduct a sewer inspection precludes her claim of fraudulent concealment.

Donna seeks reinstatement of her fraudulent concealment claim, arguing she had no duty to conduct a sewer inspection. We review the order granting summary judgment de novo, engaging in the same inquiry as the trial court. Beal Bank, SSB v. Sarich, 161 Wn.2d 544, 547, 167 P.3d 555 (2007). Dismissal of the fraudulent concealment claim is appropriate only if there are no genuine issues of

---

[3] Donna also asserted a claim against Sherry under Washington's Consumer Protection Act, chapter 19.86 RCW, but agreed to the dismissal of that claim. Thus, it is not on appeal.

material fact, entitling Catherine and Mike to judgment as a matter of law. Jackowski v. Borchelt, 174 Wn.2d 720, 729, 278 P.3d 1100 (2012); see also CR 56(c). Summary judgment is appropriate if a plaintiff fails to make a showing sufficient to establish the existence of an element essential to a claim; failure of proof on an essential element renders all other facts immaterial. Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co., 115 Wn.2d 506, 516, 799 P.2d 250 (1990); Woody v. Stapp, 146 Wn. App. 16, 21, 189 P.3d 807 (2008).

To establish a claim of fraudulent concealment, Donna must show (1) that the house had a concealed defect, (2) that Catherine knew of the defect, (3) that the defect presented a danger to Donna's property, health, or life, (4) that Donna did not know about the defect, and (5) that a "careful, reasonable inspection" by Donna would not have disclosed the defect. Douglas v. Visser, 173 Wn. App. 823, 833, 295 P.3d 800 (2013). Donna bears the burden of showing all five elements by clear, cogent, and convincing evidence. Stieneke v. Russi, 145 Wn. App. 544, 560-61, 190 P.3d 60 (2008). Parties disputed only the fifth element at summary judgment.

We agree with the trial court that Donna cannot prove that the sewer defects would not have been discovered during a pre-purchase sewer inspection. Donna argues that the reasonableness of her decision to forgo a pre-purchase sewer inspection presents an issue of fact for the jury. But the inquiry in a fraudulent concealment claim is not whether Donna acted reasonably; the issue is whether a reasonable inspection would have uncovered the alleged defect. See Alejandre v. Bull, 159 Wn.2d 674, 690, 153 P.3d 864 (2007) (homebuyers failed to meet burden of showing that defect would not have been discovered through a reasonably

diligent inspection); Atherton, 115 Wn.2d at 525 (alleged violations were not apparent and would not have been revealed through a reasonably careful inspection); Stieneke, 145 Wn. App. at 561-62 (history of roof leaks would only be apparent after a multi-day, invasive inspection costing approximately $10,000.00).

The undisputed evidence shows that a reasonable, low-cost sewer inspection would have revealed the sewer defect. Donna's own expert, Chris Gemmer, testified that he conducted a video camera inspection of the sewer pipes in March 2017 and discovered the pipes were in such bad condition that Donna had to replace nearly all of them.

Donna relies on Sloan v. Thompson, 128 Wn. App. 776, 115 P.3d 1009 (2005), to argue that she had no duty to conduct a sewer inspection because she had no notice of the possibility of a defective sewer. But Sloan is clearly distinguishable. In that case, after two earthquakes damaged a home Sloan purchased from Thompson, Sloan discovered structural defects in the foundation and framing, defects in the plumbing and electrical systems, and a non-functioning septic drain field. Id. at 782. Thompson had personally built, plumbed, and wired the house and had the septic system installed without a permit. Id.

Sloan sued, alleging fraudulent concealment. Id. The trial court found for Thompson at trial because Sloan had not conducted an inspection of the house before purchasing it. Id. at 783. This court reversed, holding that "a fraudulent concealment claim may exist even though the purchaser makes no inquiries which would lead him to ascertain the concealed defect." Id. at 789 (quoting Atherton, 115 Wn.2d at 525). But Sloan clearly dealt with defects that would "not have been noticeable to a trained eye." Id. at 789-91. This court noted that "undisputed expert

- 11 -

testimony established that a careful, reasonable inspection would not have disclosed the defect[s]." Id. at 791.

This case is more analogous to Alejandre v. Bull, in which our Supreme Court affirmed the dismissal of a fraudulent concealment claim against the seller of a home with a defective septic system. 159 Wn.2d at 678, 689-90. In that case, the buyer accepted the septic system even though an inspection report disclosed that the inspection was incomplete because a back baffle had not been inspected. Id. at 690. This part of the septic system was relatively shallow and easily accessible for inspection. Id. Because a careful examination would have led to the discovery of the defective baffle and to further investigation, the buyer's fraudulent concealment claim failed. Id. at 689-90.

In this case, the REPSA advised Donna to hire an inspector to determine if there were any problems with the plumbing system. The inspection addendum gave her six days to conduct an initial inspection and an additional day for a specialist to conduct a more in-depth investigation if necessary. The optional clauses addendum gave Donna the right to conduct an inspection within five days of closing to verify that no defects had developed with the plumbing system, and Donna had the right to demand that Catherine repair any malfunctioning system discovered during that final walk-through.

Donna was aware her structural inspector had looked at the crawl space during his inspection. But she knew this inspector was not going to inspect the sewer. And she also had notice of possible plumbing defects before the sale closed. When she was in the crawl space the day before the scheduled closing, she took photos of the "wet sand" she discovered and testified that the condition

- 12 -

she found then looked similar to the conditions she found in the crawl space in March 2017. Donna clearly became aware of some water problem in the crawl space under the home before the sale became final. Where there is some indication of the defect, purchasers are required to make further inquiries. Douglas, 173 Wn. App. at 832; Puget Sound Serv. Corp. v. Dalarna Mgmt. Corp., 51 Wn. App. 209, 215, 752 P.2d 1353 (1988). Donna emailed her photos to Sherry and her loan officer, and they discussed the possibility of pushing the closing date to make further inquiries. Donna, however, chose not to do so and instructed Sherry to proceed with the closing. Donna's argument that the moisture problems did not necessarily indicate a sewer problem is unavailing. See Miebach v. Colasurdo, 102 Wn.2d 170, 176, 685 P.2d 1074 (1984) ("[K]nowledge of facts sufficient to excite inquiry is constructive notice of all that the inquiry would have disclosed.").

Furthermore, Donna knew she should have a sewer scope done because the house was so old. Sherry recommended that Donna undertake this inspection simultaneously with the structural inspection, but Donna intentionally chose to reject this recommendation. Donna did not ask Catherine for more time to conduct the sewer scope, either after the expiration of the Initial Inspection Period or when she discovered water in the crawl space immediately before closing. When Donna hired a plumber to investigate her sewer pipes, he was able to quickly discover the defects in the system. Under these undisputed facts, Donna cannot establish that a careful, reasonable inspection would not have uncovered the sewer defect. We affirm the dismissal of her fraudulent concealment claim.

B. Donna presented no evidence that she relied on any representations in the Form 17.

Next, Donna seeks reinstatement of her fraudulent misrepresentation claim, arguing that Catherine's statement on the Form 17 that the side sewer was connected to the city sewer was false.

To establish fraudulent misrepresentation, Donna must prove (1) Catherine made a representation of an existing fact, (2) the representation was material to the transaction, (3) the representation was false, (4) Catherine knew the representation was false, (5) Catherine intended that Donna rely on the false representation, (6) Donna was ignorant of its falsity, (7) Donna relied on the false representation, (8) Donna had a right to rely on the representation, and (9) Donna suffered damages in reliance on the false representation. Steineke, 145 Wn. App. at 563. Donna must prove every element by clear, cogent, and convincing evidence. Id. On summary judgment, Catherine contended, and the trial court concluded, that Donna failed to establish the seventh (actual reliance) and eighth elements (right to rely).

Generally, "[a] party to whom a positive, distinct and definite representation has been made is entitled to rely on that representation and need not make further inquiry concerning the particular facts involved." Douglas Nw., Inc. v. Bill O'Brien & Sons Constr., Inc., 64 Wn. App. 661, 679, 828 P.2d 565 (1992). Purchasers of property generally have a right to rely on a seller's written representations. Jackowski, 174 Wn.2d at 738 (purchaser had right to rely on representation in Form 17 that property did not contain fill material); see also McRae v. Bolstad, 32 Wn. App. 173, 177, 646 P.2d 771 (1982). But reliance on a fraudulent

- 14 -

misrepresentation must be reasonable under the circumstances. <u>Williams v. Joslin</u>, 65 Wn.2d 696, 698, 399 P.2d 308 (1965). While justifiable reliance is normally a question of fact, summary judgment is appropriate if reasonable minds could reach but one conclusion. <u>Cornerstone Equip. Leasing, Inc. v. MacLeod</u>, 159 Wn. App. 899, 905, 247 P.3d 790 (2011).

On appeal, Donna argues that Catherine, in the Form 17, misrepresented that the house was "connected" to the city sewer main. She contends the evidence establishes that Catherine knew that this connection had been severed by deteriorated, misaligned, or blocked sewer pipes. Even if a jury were to accept this evidence as true, however, there remains a lack of evidence that Donna reasonably relied on the "connection" misrepresentation. First, when Donna was asked on which representations she relied in the Form 17, the only statements she identified were in section 3, paragraphs E and F. Paragraph E provided:

> Are all plumbing fixtures, including laundry drain, connected to the sewer/on-site sewage system?  [x] YES

And paragraph F provided:

> Have there been any changes or repairs to the on-site sewage system?  [x] YES

As to paragraph E, Donna acknowledged that Catherine also indicated, in section 5, paragraph A of the same form, that she did not know if the plumbing system had any defects. Donna recognized this statement was a "red flag" to her that "there might be some issues with this plumbing." As a result, Donna testified she wanted to have a sewer inspection performed and knew it was important to do so because of the age of the house. "The 'right to rely' element of fraud is intrinsically linked to the duty of the one to whom the representations are made to

exercise due diligence with regard to those representations." Alejandre, 159 Wn.2d at 690. Given Donna's admission that she knew there could be issues and yet chose not to conduct a sewer inspection, she failed to present evidence that she had a right to rely on the representation in paragraph E.

Even if Donna had a right to rely, she stated she did not actually rely on any statement in the Form 17. She stated in an email that she decided to forgo the sewer inspection because she did not feel it was necessary. She later testified that she relied on Sherry's comment that the sewer line should be "fine because the seller's husband is a plumber." No reasonable jury could find from this undisputed evidence that, in deciding to forgo the sewer inspection, Donna relied on Catherine's representation that all of the plumbing fixtures were connected to the city sewer.

As to paragraph F, that question by its terms related only to properties with an on-site sewage system. It is undisputed that Catherine's home was not served by a septic system but was instead served by a public sewer system. Even if Donna had interpreted this question to apply to Catherine's home, Catherine disclosed that there had been "changes or repairs" made to the system. This disclosure does not meet Douglas Northwest's requirement of a "positive, distinct and definite representation" of a specific condition or lack of defect. Catherine made no representation as to what specific changes or repairs had been made to the sewer, and Donna did not request more details. Thus, no jury could find that she justifiably relied on any representation in paragraph F in making this

purchase.[4] For these reasons, the trial court did not err in dismissing Donna's fraudulent misrepresentation claim.

C. Without proof of fraud, Donna cannot establish a conspiracy to commit fraud.

Donna next contends the trial court erred in dismissing her conspiracy claim. Donna alleges that Catherine conspired with her husband and her real estate agent to hide the sewer defects.

A civil conspiracy is a combination of two or more persons agreeing to commit an unlawful act—in this case, fraud. O'Brien v. Larson, 11 Wn. App. 52, 55, 521 P.2d 228 (1974); see also Woody, 146 Wn. App. at 22. There must be evidence that a tortious act was committed in carrying out the alleged conspiracy. See RESTATEMENT (SECOND) OF TORTS § 876 cmt. b (AM. LAW INST. 1966). Because Donna had insufficient evidence to establish that Catherine engaged in fraud, she could not establish that Catherine conspired with others to commit fraud. The trial court did not err in dismissing this claim.

D. Donna failed to present evidence that Sherry breached the standard of care applicable to real estate agents or that she proximately caused Donna's damages.

Lastly, Donna contends Sherry committed professional malpractice by violating RCW 18.86.050(1)(c). This statute provides that real estate agents must advise clients "to seek expert advice on matters relating to the transaction that are

---

[4] Donna argues that upholding the trial court's decision will lead to sellers feigning ignorance of material defects, rendering the Form 17 at best, useless, and at worst, misleading and counterproductive. But Donna did not raise this argument below. An argument not made to the trial court, especially on a summary judgment motion, will not be considered for the first time on appeal. RAP 9.12; see also Vernon v. Aacres Allvest, LLC, 183 Wn. App. 422, 436, 333 P.3d 534 (2014). We will thus not address it here.

- 17 -

beyond the agent's expertise." But Donna had no evidence to establish Sherry breached this statutory provision.

Donna alleged below that Sherry failed to recommend a sewer inspection. There is no evidence to support this allegation. Sherry testified she told Donna she should obtain a sewer inspection and produced an email in which she asked Catherine's real estate agent if she could schedule the inspection on September 28, 2016.

Donna's deposition testimony further undermines her claim that Sherry failed to recommend a sewer inspection. On the first day of her deposition, October 12, 2017, Donna initially testified that Sherry did not recommend a sewer inspection. But during the second day of her deposition on November 20, 2017, Donna admitted that she and Sherry discussed getting a sewer inspection:

Q: You don't know what you're alleging in this case against [Sherry]?

A: I discussed several times the sewer inspection. I didn't know that she had scheduled an appointment to have one done, so I – whether she failed or not, I – I didn't have one done, so she – she may have failed me by not pushing harder to have one done.

Q: Your testimony is that [Sherry] never talked to you about trying to get a sewer inspection; is that correct?

A: Not during this time, no, I don't recall her scheduling an appointment for a sewer inspection.

. . . .

Q: Did you ever send [Sherry] an e-mail asking her why do I not have a sewer inspection?

A: I don't recall sending her an e-mail like that.

Q: Do you ever remember having a telephone call like that with her?

A: We may have had a phone conversation about it.

- 18 -

Q: What do you mean you may have? Did you or did you not, do you recall or do you not recall?

A: I know I talked to [Sherry] about getting the sewer inspection done and I didn't want to have one done until I saw the structural inspection.

. . . .

Q: Okay. This e-mail exchange with [Sherry], trying to set a sewer inspection is also on September 28th, correct?

A: Yes, I saw that.

Q: So what were you waiting for?

A: To go through the [structural] inspection report.

In light of this admission, no reasonable jury could conclude from this evidence that Sherry breached RCW 18.86.050 by failing to advise Donna to obtain a sewer inspection.

On appeal, Donna contends that despite her admitted conversations with Sherry about the advisability of a sewer inspection, Sherry did not document her advice or Donna's refusal to take this advice. But Donna cites no authority for the proposition that a real estate broker breaches the standard of care by failing to document either her advice to a client or a client's refusal to follow that advice, particularly when the client admits she refused to do so.

Even if documentation were required to meet a standard of care, Donna was advised in writing in the Form 17 to obtain expert advice regarding the home:

The following are disclosures made by seller and are not the representations of any real estate licensee or other party. . . .

For a more comprehensive examination of the specific condition of this property you are advised to obtain and pay for the services of

- 19 -

qualified experts to inspect the property, which may include, without limitation, . . . plumbers, . . . .

And when Donna signed the Form 17, she acknowledged the following:

> Buyer hereby acknowledges receipt of a copy of this disclosure statement and acknowledges that the disclosures made herein are those of the seller only, and not of any real estate licensee or other party.

Donna was also advised in writing in the REPSA that Sherry, identified as the "Selling Broker," lacked the expertise to identify defects in the home:

> Brokers do not have the expertise to identify or assess defective products, materials, or conditions. Buyer is urged to use due diligence to inspect the Property to Buyer's satisfaction and to retain inspectors qualified to identify the presence of defective materials and evaluate the condition of the Property as there may be defects that may only be revealed by careful inspection.

Donna was adequately advised that she needed to inspect the home to identify any defects, and her argument that Sherry failed to document their inspection discussions is insufficient to revive her professional malpractice claim.

Donna next argues that Sherry breached the standard of care by telling her that a sewer inspection probably was not necessary because Mike was a plumber. But Donna admits that this statement, if made, occurred <u>after</u> Donna had already allowed the six-day Initial Inspection Period to lapse. She testified that "[Sherry] advised me that we didn't need such an inspection because 'the seller's boyfriend was a plumber.' That was after the inspection period." To demonstrate that a real estate broker's breach of the standard of care was the proximate cause of the plaintiff's injury, the plaintiff must demonstrate both cause in fact and legal causation. <u>Beauregard v. Riley</u>, __ Wn. App. 2d __, 443 P.3d 827, 831 (2019). Cause in fact is established by showing that "but for" the defendant's breach, the

plaintiff's alleged injury would not have occurred. Id. Because Donna waited until after the inspection period lapsed to discuss scheduling the sewer scope, she cannot establish that Sherry's comment on the necessity of having this inspection completed was the "but for" cause of her damages.

Indeed, when asked why she did not request more time to conduct a sewer inspection, Donna simply answered, "I don't know why I didn't ask that." Had Donna followed Sherry's advice and paid for simultaneous structural and sewer inspections, Donna would have discovered the problems she encountered months later. This record does not create a genuine issue of material fact on either breach of the standard of care or proximate cause. Thus, the trial court did not err in dismissing Donna's malpractice claim against Sherry.

E. The trial court erred in denying Catherine's motion for attorney fees.

On her cross-appeal, Catherine contends the trial court erred in denying her motion for attorney fees under the REPSA. We agree.

Whether a party is entitled to attorney fees is an issue of law reviewed de novo. Boguch v. Landover Corp., 153 Wn. App. 595, 615, 224 P.3d 795 (2009). If an action in tort is "based on a contract" containing an attorney fee provision, the prevailing party is entitled to attorney fees. Brown v. Johnson, 109 Wn. App. 56, 58, 34 P.3d 1233 (2001). An action is "on a contract" if the action arose out of the contract, and if the contract is central to the dispute. Id.

Paragraph "q" of the REPSA provided:

[I]f Buyer or Seller institutes suit against the other concerning this Agreement[,] the prevailing party is entitled to reasonable attorneys' fees and expenses.

The trial court denied Catherine's request for fees, concluding that Donna's tort claims did not "concern the agreement." The trial court reasoned that the phrase "concerning this Agreement" was narrower than provisions allowing for fees in disputes "related to" an agreement, and expressly distinguished Alejandre and Hudson v. Condon, 101 Wn. App. 866, 6 P.3d 615 (2000).

We see no distinction, however, between the phrase "concerning this agreement" and "relating to this agreement." "Concern" is defined as "to relate or refer to." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 470 (2002). The provision here is just as broad as the provision in Alejandre, in which the Supreme Court awarded attorney fees, 159 Wn.2d at 691-92, and the provision in Hudson, in which Division Three of this court awarded attorney fees, 101 Wn. App. at 877-78.

Moreover, Brown is dispositive of the issue. In that case, the purchase and sale agreement provided (as here) that "[i]f Buyer [or] Seller . . . institutes suit concerning this Agreement, . . . the prevailing party is entitled to . . . a reasonable attorney's fee." 109 Wn. App. at 59. This court remanded for an award of attorney fees because Brown's misrepresentation claims arose out of the agreement to sell Johnson's home to Brown. Id. at 59-60; see also Douglas, 173 Wn. App. at 835 (citing to Brown and awarding attorney fees to sellers because the action in tort was based on a contract containing an attorney fee provision).

As in Brown, Donna's claims of misrepresentation arose out of the REPSA because Catherine's defenses to liability focused on Donna's right to inspect the home under the inspection addendum and Donna's decision to forgo the inspection she was contractually entitled to undertake. See Edmonds v. John L. Scott Real

- 22 -

Estate, Inc., 87 Wn. App. 834, 855-56, 942 P.2d 1072 (1997) (buyer's breach of fiduciary duty claim arose out of earnest money agreement because defense to claim rested on language of that agreement).

The REPSA was similarly central to the dispute between Donna and Catherine. The due diligence requirement of paragraph "x" of the REPSA's general terms, the inspection provision in the financing addendum, the pre-closing reinspection provision in the optional clauses addendum, and the inspection protocol in the inspection addendum, were all relevant to analyzing Donna's fraud claims.

Finally, we note that Donna's misrepresentation claim was based on a statement in the Form 17 that the home was "connected" to the public sewer. Yet, this same representation is contained in the REPSA. Paragraph 5 of the optional clauses addendum provided that "[t]o the best of Seller's knowledge, Seller represents that the Property is connected to a: . . . public sewer main; . . . ." Although the Form 17 did not become a part of the REPSA, the representation regarding the connection to the sewer main explicitly did because it appears in the optional clauses addendum.

For these reasons, we conclude the trial court erred in denying Catherine's motion for an award of attorney fees under paragraph "q" of the REPSA.

F. The trial court did not abuse its discretion in denying Sherry's motion for CR 11 sanctions.

Finally, Sherry appeals the trial court's order denying her request for fees and costs under CR 11. She contends that once Donna was deposed on October 12, 2017, it was clear that any claim that Sherry failed to advise Donna to obtain a

sewer inspection was factually unfounded and thus frivolous. Sherry contends Donna's decision to file a second amended complaint, after the deposition occurred, was sanctionable under CR 11.

We review a decision on CR 11 sanctions for an abuse of discretion, asking whether the trial court's decision was manifestly unreasonable or based on untenable grounds. MacDonald v. Korum Ford, 80 Wn. App. 877, 884, 912 P.2d 1052 (1996). A trial court may award fees under CR 11 against an attorney or a party for filing a pleading that is not grounded in fact or warranted by law or is filed in bad faith for an improper purpose. Loc Thien Truong v. Allstate Prop. & Cas. Ins. Co., 151 Wn. App. 195, 207, 211 P.3d 430 (2009). Because CR 11 sanctions have a potentially chilling effect, the trial court should impose sanctions only when it is patently clear that a claim has absolutely no chance of success. Id. at 208. Just because a case is factually weak and an order for summary judgment is affirmed, "does not mean that the case was entirely groundless or advanced for an improper purpose." Id.

The purpose behind CR 11 is to deter baseless filings and to curb abuses of the judicial system. Bryant v. Joseph Tree, Inc., 119 Wn.2d 210, 219, 829 P.2d 1099 (1992). CR 11 sanctions may not be awarded unless a trial court finds that the attorney who signed and filed the complaint failed to conduct a reasonable inquiry into the factual and legal basis of the claim. Id. at 220. The reasonableness of the inquiry is evaluated under an objective standard. Id. Thus, the courts should not employ the "wisdom of hindsight" to evaluate a CR 11 claim. Id.

We find no abuse of discretion in denying Sherry's motion for CR 11 sanctions. Donna alleged in her second amended complaint, filed on December

- 24 -

13, 2017, that Sherry was negligent in failing to recommend that a sewer inspection be conducted before the purchase and that Sherry was negligent in recommending against a sewer inspection. These allegations were based on testimony Donna provided on two days of deposition, October 12, 2017, and November 20, 2017. As indicated above, Donna testified in the October 12 deposition that Sherry did not recommend a sewer inspection. That testimony changed on November 20, 2017, when she stated that Sherry had initially recommended this inspection, but Donna wanted to wait until after she saw the results of the structural inspection, and that by the time she received that report, the inspection period had lapsed.

First, when Donna filed her second amended complaint, Sherry had not yet been deposed. It is understandable for an attorney to choose to wait to evaluate the factual strength of a claim until both parties to a particular conversation have been deposed.

Second, in opposing Sherry's CR 11 motion, Donna argued her claim was based on a "later discussion, after the close of the inspection period, where [Sherry] advised that a sewer inspection was not needed." Sherry argued in reply that Donna's reliance on such a comment was not credible given that she "could have requested the [sewer] inspection even up until closing but directed closing regardless." Given Sherry's argument, counsel argued that Sherry's comment dissuaded Donna from requesting an inspection after the inspection period had lapsed. Although we conclude that Donna's claim was appropriately dismissed on summary judgment, we understand why the trial court did not deem the claim to be completely baseless. The trial court did not abuse its discretion in denying Sherry's CR 11 motion.

We affirm the dismissal of Donna's claims against Catherine and Mike Conover and against Sherry Voelker-Hornsby. We affirm the denial of Sherry's CR 11 motion. We reverse the order denying Catherine's motion for attorney fees and remand for further proceedings consistent with this opinion.

Catherine, as prevailing party in this court, is entitled to an award of attorney fees and costs in this appeal, subject to compliance with RAP 18.1. Because neither Donna nor Sherry have prevailed on their claims, we deny their requests for attorney fees and costs on appeal.

_Andrus, J._

WE CONCUR:

_Mann, ACJ_

_Leach, J._